(No. 12068.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN FREELAND, Plaintiff in Error.

*Opinion filed June 20, 1918.*

CRIMINAL LAW—*judgment should be reversed when evidence does not establish guilt beyond a reasonable doubt.* A reviewing court should give due weight and importance to the verdict of the jury, and a judgment of conviction will not be reversed simply because the evidence is conflicting, but where the evidence fails to establish guilt beyond a reasonable doubt it is the duty of a reviewing court to reverse the judgment.

WRIT OF ERROR to the Circuit Court of Christian county; the Hon. THOMAS M. JETT, Judge, presiding.

JOHN E. HOGAN, and EDMUND BURKE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, HARRY B. HERSHEY, State's Attorney, and ALBERT D. RODENBERG, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

On the morning of May 26, 1916, between three and four o'clock, the post-office at Edinburg, Christian county, was burglarized. The safe was blown open with some explosive, the wood partitions or pigeon holes inside split and torn up and a number of postage stamps and some money stolen. In the afternoon of the same day plaintiff in error was arrested in Edinburg on suspicion of having committed the crime. At the August term, 1917, of the Christian county circuit court he was indicted for burglary and larceny. In their brief counsel for the State explain that the delay in returning the indictment was due to the fact that plaintiff in error was turned over to the Federal authorities, who failed to prosecute him, and the case was then pre-

sented to the grand jury of Christian county. Plaintiff in error was tried at the November, 1917, term, convicted and sentenced to imprisonment in the penitentiary. He brings the record here for review.

There was found on plaintiff in error, when arrested, a pocket knife with a postage stamp sticking to the handle and a small piece of wood in one of the pockets. There were some dark spots on the blade of the knife. Plaintiff in error was in an exhausted and nervous condition when arrested, sitting on the front steps of the Baptist church. About noon of the day following the burglary, and before plaintiff in error was arrested, Mrs. Porter testified she saw him come from a branch south of her house, which was just across the street from the Baptist church. He went across the south part of the church yard into a toilet. That evening, about six o'clock, witness and another woman went to the branch at the place she said the plaintiff in error came from and found there some small particles of polished wood, some not polished and a small piece of card-board, also a stamp, upon which she wrote her initial, all of which she gave to the post-master. She identified the pieces of wood and card-board and stamp exhibited to her as the same she found at the branch and gave to the post-master. The stamp witness picked up at the branch was sticking to a fragment of the envelope it had been put on. The corner of the envelope on which the stamp was placed had been torn off and the stamp was sticking on it. The inside of the envelope was of a gray color. Miss Emma Kelly testified for the State that she was at her home, a block south of the Baptist church, when the explosion occurred. There is a stream back of the church and not quite a half block from the witness' house. About three or four o'clock on the morning of the robbery she heard talking and someone coughing like he was sick and vomiting, which sounded like the parties were at the bridge north of her house. She saw a man go east past her house followed by a little dog.

About noon that day she saw a man leave the out-building of the church and go around in front. The post-master and some other witnesses testified to making a search and finding, about half a quarter of a mile east of Miss Kelly's residence and southeast of the church, some stamps, burglars' tools, a revolver, fuse and fuse caps. These were all preserved and introduced in evidence at the trial. The knife and fuse were by a post-office inspector turned over to two chemists employed in the United States department of agriculture, and they made a chemical analysis of the dark material on the knife blade and of the fuse and stated both contained coal tar pitch and nitrates. The wood found by Mrs. Porter at the branch resembled the pieces of wood partitions in the safe. An envelope, a corner of which where the stamp had been attached had been torn off, was found in the building when the safe was blown open and was of the same color inside as the piece of envelope which Mrs. Porter picked up at the branch, to which a stamp was attached. Harry Gaddis, who had served time in the penitentiary for burglary and was at the time of the trial a Federal prisoner in the Danville jail, testified he knew plaintiff in error in Springfield, Illinois, and had a talk with him there some time in March, 1917. He testified plaintiff in error saw him talking with Basil Joy, and that after Joy left the bar-room where the conversation occurred, plaintiff in error told witness he had better keep away from Joy,— that he could not be trusted. He then told witness about the Edinburg post-office robbery, and said Joy stood outside while plaintiff in error blew the safe. After blowing it plaintiff in error's stomach was so weak from drinking intoxicants that the gas made him sick. Joy thought he was going to die and took him to and left him at an old church at the edge of Edinburg. Joy took the money and an automobile and went to Springfield. He left some papers where he thought they would be found, to cause suspicion of plaintiff in error.

Plaintiff in error proved by a number of witnesses that he was in Springfield until midnight May 26, the night of the burglary, and this proof was not contradicted. Springfield is about twenty miles from Edinburg. Witnesses testified that the plaintiff in error was that night under the influence of intoxicating liquor and had been constantly intoxicated for a month or more before that time, and one witness testified that he met the plaintiff in error on the street in Springfield about eight o'clock in the evening of the night of the burglary and that he was bordering on delirium tremens. Other witnesses testified to his being intoxicated that evening. W. L. Burke, at whose house in Springfield plaintiff in error roomed, testified he was in his room at ten o'clock in a drunken stupor and witness took him a pitcher of water; that he heard him rolling and tossing in his bed about eleven o'clock. This witness was corroborated by his wife. A saloon-keeper testified plaintiff in error was in his saloon about midnight and seemed drunk and demented. Plaintiff in error was next seen some time the next day in a church yard in Edinburg.

The State introduced in evidence a sworn statement in writing made by plaintiff in error to a post-office inspector in the jail at Taylorville, May 30, in which plaintiff in error said that on the night of May 25-26 he was very nervous from having been intoxicated several weeks; that he could not sleep; that he got out of bed about midnight and concluded to go to Pana; that he went to the yards of the Baltimore and Ohio Southwestern railway and about two o'clock caught a freight train going south; that the train stopped at some station and he got off; that the station was Edinburg; that he arrived there about four o'clock in the morning and being very thirsty went in search of a drink of water; that he finally found a small stream where he drank; that this was about daybreak; that after drinking he became sick and vomited; that he could not tell how long he remained there; that he next went to a toilet in the rear

284 — 13

of a church, where he again vomited and remained probably several hours; that later in the day he went to the same brook for another drink of water and returned to the closet, where he stayed some time; that he remembered asking a boy to get him a drink of water, which the boy did; that after that he went around in front of the church and sat on the steps to rest and was there arrested.

Paul Ducker, a witness residing in Edinburg, testified he was at the Baltimore and Ohio railroad tracks about four o'clock in the morning of the burglary and saw a freight train come in. It stopped at the cattle pens and did some switching. He saw a man alight from the train. The man came down right by witness and turned east toward the school house. In the afternoon of the same day he saw the same man at the city hall under a shade tree. He recognized plaintiff in error as the same man. The witness testified he looked toward the depot but saw no one there. Three witnesses testified in rebuttal for the State that they were at the depot when the freight train came in and that it did no switching.

The foregoing is a brief summary of the most important testimony.

The errors alleged and argued in the briefs are, that the evidence was not sufficient to justify the verdict and judgment; that the court admitted improper evidence; and that the court erred in permitting improper remarks by the State's attorney.

It is certain from the testimony that plaintiff in error left Springfield the night of the burglary as late or later than midnight. It is not contended that if he went to Edinburg by train he could have reached there on any other train after midnight than the freight on which he said he went. That train did not arrive at Edinburg until after the burglary had been committed. Aside from a pocket knife with dark spots on the blade, an uncanceled postage stamp sticking to the handle, and a small splinter of wood found in the

pocket of plaintiff in error, there was nothing on his person or in his possession to indicate he had committed the crime. It was testified by chemists that the spots on the knife were composed of material containing coal tar pitch and nitrates, and the fuse found with the burglars' tools, caps and revolver had the same materials in it. These things were found some distance from any place the plaintiff in error had been seen by anyone, and while they were offered and admitted in evidence there was no testimony whatever to in any way connect him with them. Some $300 worth of stamps and $57 or $58 in money were taken from the safe. None of the money and no stamps except the one sticking to his knife handle were found on plaintiff in error. Some stamps were found where the burglars' tools and revolver were found. The evidence, all considered, did not establish the guilt of plaintiff in error with that degree of certainty required to justify conviction. The only direct evidence of guilt was the testimony of the witness Gaddis as to admissions made by plaintiff in error, and under the unsatisfactory state of the evidence in the case we do not feel warranted in giving his testimony such credit and weight as to justify affirming the judgment. If, as before stated, plaintiff in error went to Edinburg on the freight train, as he claimed in his statement to the post-office inspector, he did not commit the crime. A resident of Edinburg, Paul Ducker, in no way related to plaintiff in error and totally disinterested, testified he saw him alight from the freight train. Three witnesses for the State testified they were at the depot when the train arrived and did not see plaintiff in error. It is argued by the State that Ducker's testimony should not be believed because he said the train did some switching and the other three witnesses said it did not; also that Ducker testified he did not see the other three witnesses at the depot although he looked in that direction. Such discrepancies would not warrant us in disregarding the testimony of a witness whose truthfulness and reliability are

not otherwise affected or questioned. True, a reviewing court, in criminal as well as in civil cases, should give due weight and importance to the verdict of the jury, and judgments of conviction will not be reversed simply because the evidence is conflicting. Where, however, the whole evidence considered, it fails to establish guilt beyond a reasonable doubt it is the duty of a reviewing court to reverse the judgment. *People* v. *McMahon*, 254 Ill. 62.

A careful consideration of the evidence convinces us that we would not be justified in affirming the conviction. The judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*