(No. 15402.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN KOLOSKI, Plaintiff in Error.

*Opinion filed October 20, 1923.*

1. CRIMINAL LAW—*effect of proof of good reputation for honesty and integrity.* Proof of the good reputation for honesty and integrity is not proof of innocence but may be sufficient to raise a reasonable doubt of guilt when the other evidence is not of a satisfactory character.

2. SAME—*when judgment of conviction must be reversed.* The finding of a stolen automobile in the defendant's barn does not, alone, justify his conviction for receiving stolen property, where his own testimony, corroborated by two neighbors, is that he had given permission to two men to leave the car in his barn for a few days, the only suspicious circumstance being that the officers testified he told them the car had been there two weeks, whereas the defendant testified that he told them two days.

WRIT OF ERROR to the Circuit Court of Montgomery county; the Hon. T. M. JETT, Judge, presiding.

MILLER, MAJOR & MAJOR, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, FRANK M. RAMEY, State's Attorney, and JAMES B. SEARCY, (LESTER K. VANDEVER, of counsel,) for the People.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error, John Koloski, alias Collaski, was indicted by the grand jury of Montgomery county for receiving stolen property (an automobile) of the value of $700, the property of Joseph Moritz, to prevent the owner from again possessing it, then and there well knowing the automobile had been stolen. He was convicted and sentenced to imprisonment in the penitentiary and has sued out this writ of error.

The errors argued in plaintiff in error's brief are: (1) The evidence is not sufficient to warrant a conviction; (2)

erroneous instructions were given for the People; (3) the State's attorney made improper and prejudicial remarks in his argument to the jury.

Joseph Moritz drove his car, a Cleveland Six, to the Kortkamp mine, where he worked, September 28, 1922. When he quit work, about 9:30 o'clock at night, the car was gone. He did not see it again until he, William Woods, Pink Fleming, deputy sheriff, and Jack Skinn found it in the barn of the plaintiff in error in Panama, Montgomery county, October 5. The four men, in two cars, drove to Panama the night of October 5 looking for the stolen car. They first went to the house of Tony Moreland and then drove to the house of plaintiff in error, who is a coal miner in Panama. It was about midnight when the party arrived at the house of plaintiff in error. He and his family were in bed. Woods and Skinn went to the door, knocked, and called plaintiff in error out of bed. When he came to the door Woods asked him if he had a car, and he answered he had a Ford. Woods asked if they could see it, and plaintiff in error said they could and went to the barn with them. When they saw the car, Skinn, who knew the Moritz car, told Woods it was not the car they were looking for. One of the party went around to another part of the barn, and looking through an opening in the door saw, with the aid of a flashlight, another car in the barn. They opened the door and the car was Moritz's car. The license plate and bumper had been removed and were in the car. Plaintiff in error told the parties two men, who were strangers, came to his house one night and asked permission to leave the car in his barn and that he permitted them to do so. Woods and Skinn testified he said the car was left in his barn about two weeks before the night they found the car. Skinn testified the door where the car was found was fastened by a timber nailed across it and he removed it.

Plaintiff in error testified he had lived in Panama ten or twelve years and most all that time had been a coal miner.

He told about officers coming to his house after he was in bed and about their finding in his barn the car they said they were looking for. He testified that about midnight two days before, two men came to his house, called him out of bed, and said his neighbor, Baphista Malugani, had directed them to him and said he had a garage they could put their car in. They were strangers, and the one who did the talking spoke pretty good American. They said the car was not running well and they would come and get it the next day or the day after. Plaintiff in error told them they could put the car in his barn. He did not go with them to the barn, as he was only partly dressed. He started to the mine twenty minutes before six in the morning and returned about half-past four in the afternoon. He said he never did anything to the car while it was in his barn; that the doors where it was were never nailed. Plaintiff in error spoke very poor English and said he could not explain very well how the doors were fastened, but said he put a two-by-four through and that locked it. He denied he told the officers the men brought the car to his barn two weeks before and testified he told them it was two days before. He denied having anything to do with stealing the car, denied any knowledge that it was stolen, and denied he was trying to conceal it.

Mrs. Baphista Malugani testified she lived in Panama, about a block from plaintiff in error. She learned of the time the officers came to his house. A few nights before that, about midnight, two men came to the house where witness, her husband and children lived and knocked at the door. Her husband got out of bed and went to the door. He does not talk good English and called the witness to come and talk to the men. They asked if witness had a garage they could put their car in. The car was standing out in front of the house. The witness told the men she could not accommodate them but referred them to plaintiff in error and directed them where he lived. They went in

the direction of his house. This was two or three days before the officers came.

Baphista Malugani testified about the two men coming to his house and calling him out of bed. He went to the door and called for his wife to come. The men were looking for a place to leave their car. The men talked American language, and witness' wife talked to them because he could not understand very well. He did not understand all that was said but heard his wife talk about plaintiff in error. She said he had an empty barn.

The foregoing is the substance of all the testimony, except that nine witnesses for plaintiff in error testified to his good reputation for honesty. The court limited the number of character witnesses to nine.

It will be seen the only material conflict in the testimony is as to the time the car was put in the barn of plaintiff in error. Two witnesses testified he said it had been there about two weeks. That could not have been true, for the car was stolen from the owner only a week before. Defendant denied he said it had been there two weeks and testified he told the officers it had been there two days. We consider the testimony as to how the barn door was fastened as of little importance. Aside from a conflict in the testimony as to length of time plaintiff in error said the car had been in his barn, his explanation of how it came to be there, in connection with the testimony of Mr. and Mrs. Malugani, is not unreasonable and is entirely reconcilable with innocence. The two men with the car first called at Malugani's for a place to leave their car and were directed to plaintiff in error. The story he said they told him was that the car was not running well and they wanted to leave it till the next day or the day after. That he gave them permission to leave the car is not in itself so unreasonable as to establish guilt. Plaintiff in error is a foreigner, and while he gave his testimony without the aid of an inter-

preter he spoke very poor English. If, as two witnesses for the People testified, he said the car had been in his barn two weeks it would be an important circumstance in the evidence, for the car had not been stolen that long. If he said two days, as he testified he did, it corresponds with the time the two men were at Malugani's and would hardly be a circumstance that would even create suspicion. As we have said, plaintiff in error speaks poor English. According to the evidence the car had been in his barn two days. He testified he so told the officers. It is entirely possible they misunderstood him. At least, in view of all the testimony, we cannot see how it can be said guilt was proved beyond a reasonable doubt.

We are not much inclined to reverse judgments of conviction in criminal cases on the ground that the conviction was not warranted by the evidence and do not do so when the evidence is merely conflicting, but when there is such doubt from the proof as there is in this case, it is the duty of the court to reverse the judgment. (*People* v. *Freeland,* 284 Ill. 190; *People* v. *McMahon,* 254 id. 62; *People* v. *Wallace,* 279 id. 139; *People* v. *Stoneking,* 289 id. 308.) In addition to the doubtful character of the proof before referred to, nine witnesses (all the court permitted to be called on that question) testified to the good reputation of plaintiff in error for honesty and integrity. Among them were the cashier of a coal company, the village president, a doctor and two merchants. Proof of good character is not proof of innocence, but may be sufficient to raise a reasonable doubt when the other evidence is not of a satisfying character. In *Jupitz* v. *People,* 34 Ill. 516, the court said: "Proof of this kind [good reputation] may sometimes be the only mode by which an innocent man can repel the presumption of guilt arising from the possession of stolen goods." If Malugani had had a place the two men could have put their car in and it had been found there, the proof, except as to how long the People's witnesses testified plain-

tiff in error said the car had been in his barn, would have been just as strong against him as it is against plaintiff in error,—even stronger, for the Maluganis testified they told the men to go to plaintiff in error and directed them to his house. We cannot affirm a judgment which imprisons a man in the penitentiary against whom the proof is so inconclusive, and who has proved by apparently reputable citizens who had lived in Panama many years that his reputation for honesty is good.

Complaint is made of several instructions given for the People. Two of them are, we think, justly subject to criticism, but as the judgment must be reversed because the evidence was not sufficient to prove guilt beyond a reasonable doubt and the errors in instructions are not likely to be repeated in another trial, we will not discuss them.

The judgment is reversed and the case remanded.

*Reversed and remanded.*