THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES McMAHON, Plaintiff in Error.

*Opinion filed April 18, 1912.*

1. CRIMINAL LAW—*clear proof of an alleged admission upon which conviction is based is required.* In a prosecution for murder, where the evidence is entirely circumstantial and the verdict of conviction must rest almost wholly upon an alleged voluntary admission made by the accused to the witness under circumstances rendering the making of it highly improbable, the fact that the admission was made must be clearly proved before it can be accepted as the basis of a conviction.

2. SAME—*the Supreme Court cannot sustain conviction if evidence leaves question of guilt in serious doubt.* Notwithstanding the jurors are the judges of the evidence in criminal cases, it is the duty of the Supreme Court to examine the evidence when called upon to do so, and if, after a careful consideration, there remains a serious and well founded doubt of the defendant's guilt, leading to the belief that the verdict was not based upon a calm and dispassionate consideration of the evidence, the judgment must be reversed.

CARTER, C. J., and HAND, J., dissenting.

WRIT OF ERROR to the Circuit Court of Bureau county; the Hon. RICHARD M. SKINNER, Judge, presiding.

FRANK J. QUINN, and IRA C. GIBONS, for plaintiff in error.

W. H. STEAD, Attorney General, and LEONARD M. ECKERT, State's Attorney, (HOBART P. YOUNG, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error was convicted a second time of murder and sentenced to imprisonment in the penitentiary for fifteen years. The former conviction was reversed for error occurring on the trial. (*People* v. *McMahon,* 244 Ill. 45.) The second trial was had before Judge Richard M. Skinner, who died after the verdict was rendered, and the motion for a new trial was heard and decided by Judge Samuel C. Stough, who signed the bill of exceptions. The errors complained of on the record now before us are the denial of a motion for a continuance, a ruling on the admissibility of evidence, improper conduct of the assistant State's attorney, and the denial of a motion for a new trial on the grounds of bias of a juror and insufficiency of the evidence. If the first three errors exist, they are shown by the record not to have been of a character so prejudicial to the defendant as to require a reversal of the judgment. The juror was not shown to have been prejudiced. The question of the sufficiency of the evidence remains.

The circumstances immediately attending the death of Mary Hetrick, the alleged victim of the homicide, are set forth in the report of the case when it was here before and need not be repeated. The evidence is wholly circumstantial, and the important criminating circumstances now, as on the former trial, are found in the testimony of James Currens and Herbert L. Whiting. The remote events tes-

tified to by Macy Hamrick and Alice Okey are of little weight. Mary Hetrick died at about seven o'clock Saturday morning, December 5, 1908, from the effects of strychnine taken by her a few minutes earlier. Being about eight months gone in pregnancy, her condition was bound soon to become known though then suspected by no one. In such a situation a motive may be found for suicide on the part of the girl and murder on the part of the man responsible for her condition. Was the death suicide or murder? The record fails to answer the question. The immediate circumstances indicate suicide rather than murder. The defendant and his wife had been at a party the night before, which they did not leave until after midnight. In the morning Mary got up first, and soon after the defendant got up and went out to the barn to work, taking his six-year-old boy with him. He stopped in the kitchen to put on his cap and shoes. Within a half hour his wife came to call him. He returned to the kitchen to find Mary lying on the floor in convulsions and in ten or fifteen minutes more she was dead. There was strychnine in the pantry. It had been there for years. Mary had access to it. If she had resolved to end her ills at once the means were at hand. No vessel or paper was found in which strychnine had been, except the bottle on the pantry shelf, but she might easily have taken some from the bottle on a paper and dropped the paper in the kitchen fire after taking the strychnine. Her apparent cheerfulness and good spirits when the defendant's wife saw her a few minutes before she fell tend to indicate that she was not then contemplating death, yet she may have been. They also tend to indicate that she was not then in a condition which would inevitably expose her in a few weeks to public shame and disgrace, and yet she was.

The theory of the prosecution is that the defendant was the father of the unborn child and that he murdered the mother to avoid the discovery of her condition and a prose-

cution for rape to which he would be liable on account of her being less than sixteen years of age. Macy Hamrick, a girl a year or two older than Mary, testified that early in February, 1908, while the defendant's wife and children were away from home at his father's, she spent the night with Mary. The defendant was going out with a sleighing party, and he took a drink of whisky out of a bottle and invited the two girls to drink, saying there was rock candy in it. He went away, taking the bottle with him, and told the girls to sleep in the family bed-room down-stairs, which was near the fire. There were two beds in the room. The two girls went to bed together in the large bed, and the next morning, about daylight, Macy was awakened by some one in the room and got out of bed and asked who it was. The defendant answered, and she asked for Mary. Mary answered from the other bed that she was over there and that the defendant put her over there. Mary wanted her to get in bed with her and the defendant told her to go back to bed, but she refused, saying that she was going home. Both girls then got their clothes and went out in the other room and dressed. They got breakfast, and the defendant stayed in the bed-room until called to breakfast. The two girls started to school at half after eight, but Mary went back with the dog, which had followed them, leaving Macy to go on alone. Mary came into school about eleven o'clock. Miss Hamrick regarded the occurrence of no importance, never told anyone about it, continued to associate with Mary, and was at the defendant's house and spent the night with Mary in November, two weeks before her death.

Miss Alice Okey testified that she saw Mary and Macy Hamrick going to school on the morning told about by Macy when Mary went back with the dog, and that Mary came back in a couple of hours with flushed face, trembling lips and tears in her eyes. At another time in this same month of February, when Miss Okey was at the defend-

ant's house, Mary came home from school sick, threw herself on the couch and complained of her head. In a few minutes the defendant coming in, said, "Hello! what is the matter with you?" His wife looked at him darkly and said, "Yes, you, I guess! You! You!" and he eyed his wife with a very dark look but said nothing.

In June the defendant called at Dr. Landis' office and told the doctor that Mary had missed her period and he guessed he would have to get a little medicine for her. He wanted to know if the doctor could do her any good, and the latter replied that it was not unusual for a girl of her age,—a few doses of some medicine would straighten her out. He then started to get the medicine, but the defendant suggested that he had better send the girl and his wife down. The same day, or the next day, Mrs. McMahon and Mary came down and the doctor gave her a little medicine to regulate menstruation. She afterward came to the office to pay for the medicine, but the bill had been paid by the defendant.

The testimony of James Currens and Herbert L. Whiting is substantially set out in the report of the case when formerly here. In addition Whiting testified on the second trial to a conversation with the defendant in the latter part of December, in which the latter said: "If I am prosecuted for this crime I will never do another honest day's work as long as I live; there are others as deep in this as I am; you will have to tell why you gave Mary so much money and why you put your brother-in-law on the jury." The reference to the brother-in-law was to W. C. Bloom, who was on the coroner's jury, and the reference to the money was to two small sums, of fifty cents and two dollars, which Whiting had given to Mary the preceding summer. The time of this conversation was during the adjournment of the coroner's investigation to await the result of the chemical examination, and was after the defendant was being accused in the newspapers and suspected by his neigh-

bors of being guilty of murdering Mary. Whiting did not testify to this conversation on the former trial and was not asked about it.

The evidence at the second trial did not differ materially from that at the first. There were additions to or variations, more or less important, in the testimony of each of the material witnesses, but in view of the fact that they were testifying nearly three years, and in some instances longer, after the events occurred and more than two years after the former trial, the discrepancies were not, perhaps, such as to affect the credibility of the testimony generally, except as to the accuracy of details. The defendant did not testify on the first trial but did on the second. He denied the bed-room incident testified to by Macy Hamrick, the remark in April testified to by Currens, and all the incriminating statements or conversations testified to by Currens or by Whiting.

The testimony of Miss Okey is of no importance. As to the one event, it indicates only an angry feeling at the time between the husband and wife but does not even tend to throw any light on his relations with Mary. The other incident, of Mary's going back home with the dog and returning on her way to school, crying, two hours later, is entirely immaterial. Besides, the defendant, his father, mother and brother all testify, without contradiction, that on that morning, between eight and nine o'clock, the defendant came over to his father's house, where his wife was sick and his children also were staying, as was his habit while they were there, and remained until about noon. The date was fixed by his sister's wedding, on January 29, and the sleighing party the next Monday night.

No possible inference against defendant can be drawn from his call on Dr. Landis but that incident is rather in his favor. It was what would be expected of an innocent man under the circumstances, but not of one guilty of a

crime which was the cause of the girl's condition and was
likely to be discovered by investigation.

The incident testified to by Macy Hamrick has some
tendency to show the familiarity of the defendant with
Mary, and the remark which Currens testified the defend-
ant made in regard to her in April, to show his disposition
towards her. This was about the time when she must have
become pregnant, and the remark attributed to the defend-
ant indicated that he had not then had connection with her.
These are the only two circumstances in the whole record
which have any tendency to reflect in an unfavorable way
upon the relations between the defendant and Mary. No
act of freedom or of lewdness, no familiarity, no prefer-
ence or desire of either for the other's company, no op-
portunity or desire to be alone together, no immodest or
disrespectful act or word, otherwise than as has been stated,
appears in the evidence. From April until after Mary's
death, in December, the testimony is a blank, except for
the calls of the defendant and of his wife and Mary at
Dr. Landis' office, and except that it appears that Currens
and Whiting were at the defendant's until the middle of
June; that Currens and Mary slept up-stairs in different
rooms opening off the same little hall at the head of the
stairs and that no other room up-stairs was occupied; that
Macy Hamrick stayed all night at the defendant's about two
weeks before Mary's death and slept with her, and Mary
visited her mother on Thanksgiving day, nine days before
her death, and neither Macy nor Mary's mother suspected
her condition.

The circumstances occurring after Mary's death and
tending to cast suspicion on the defendant are testified to
by Whiting and Currens. Those testified to by Whiting
are the defendant's supposed objection to a second investi-
gation by the coroner, and the conversation before men-
tioned, in the latter part of December. Those testified to
by Currens are, aside from some minor circumstances, the

defendant's request to Currens to swear that the defendant did not poison "little Mary," and the conversation about Whiting's visit to the priest, in which the defendant threatened Whiting. The testimony in regard to the second inquest did not indicate that the defendant feared or was opposed to a further investigation. He was satisfied with the first verdict of suicide and did not want to have the coroner at his place any more, on account of his wife, but he suggested no other objection to another inquiry. At the time of the conversation in December the second inquest had been begun, the evidence had been heard, Currens had made his statement, the defendant had been charged with murder in the newspapers and was suspected by his neighbors. Whiting was complimenting him on his farming and the appearance of his cattle when the defendant made the statement testified to. It was not an admission of guilt. The witness did not so regard it, for he says that he did not deem it important and did not testify about it on the first trial. At any rate, it is capable of being construed as the protest of an innocent man against an unjust accusation upon insufficient evidence. Upon being complimented on his success as a farmer he protests that he will do no more work if prosecuted for this crime; that there were others as much involved as he is, and that even the person to whom he is talking will have to tell why he gave Mary money and why he put his brother-in-law on the jury.

The whole strength of the case for the prosecution really rests upon Currens' statement that the defendant said to him on December 14, speaking of Whiting, "If I thought that fellow was lying around here to squeal on me I would give him the same dose I gave the other little bitch." There are other things testified to by Currens, but this is the vital part of his testimony. The first inquest was held on Saturday. Currens was not a witness. The body was buried on Monday. Later, when it was decided to renew the investigation, Currens was subpœnaed as a witness and at-

tended on Wednesday, but one of the jurors was absent and the inquest was postponed. He was at the defendant's house that day and talked with him about Mary's death. On the following Saturday morning he went to the defendant's house, where he remained until Tuesday morning. On Friday, before going to his house, he met the defendant in Tiskilwa, and he says that the latter said to him, "Jim, you could swear I didn't poison little Mary," but he answered, "No, I can't; I wouldn't for all the money you and your father have got; I would hate to swear to a lie even for myself." On Monday the conversation is said to have taken place in which the defendant used the language quoted in regard to Whiting. The inquest was to be continued the following day. Currens says that the conversation in which the statement quoted was made occurred in the defendant's dining room. The defendant and Currens were sitting on the lounge and the defendant's wife was present. It was voluntarily made,—not in response to any question or in continuation of any previous talk, but was introduced by the defendant without any apparent reason. Currens testified that he was very much frightened by this threat and implied confession and was afraid that the defendant would poison him. The conversation occurred at about ten o'clock in the morning, however, and he stayed to dinner, but ate nothing except what he had first seen the defendant eat a part of, for fear of being poisoned, though the defendant's wife and children were also eating dinner at the same table. He went to Tiskilwa in the afternoon but came back and spent the night at the defendant's. On Tuesday morning he went away before breakfast. He was still afraid of being poisoned and refused to sit down to the table with the defendant and his family to eat breakfast, but he drank a cup of coffee offered him by Miss Okey, who was helping with the housework, being doubtful whether it was safe or not but willing to take a chance. He went to Princeton, leaving his satchel at the defend-

ant's, and after testifying at the inquest, the next day returned to the defendant's house to get his satchel. The defendant did not ask him if he had testified, but did ask how they were getting along, to which Currens replied that he did not know. The defendant did not ask him what he testified about.

The statement of the defendant was so out of the ordinary,—so unlikely to have been made to the person in the presence and under the circumstances testified to,—as to require to be clearly proved before being accepted as the basis of a conviction. Without it the case against the defendant has no foundation. The other circumstances, whether singly or together, taken at their highest value, amount to no more than suspicion. That the defendant should voluntarily have made such a statement while the investigation as to how the poison was administered was going on, to a witness who he knew would be called upon to testify on the subject the next day, taxes credulity. That the man to whom the statement was made should continue to accept the hospitality of the maker of it until the inquest and then return to the latter's house seems remarkable. Currens' testimony is somewhat discredited by certain discrepancies in it, and these, together with the whole examination and his conduct, cause us to doubt his candor and fairness. The defendant, as a witness, denied the conversation testified to by Currens as well as the statement said to have been made in April. Even taking into consideration the fact that two juries have found defendant guilty, we are convinced that the evidence is not of the conclusive character required in a criminal case to justify a conviction. Even though the jurors are the judges of the evidence in criminal cases, it is our duty to examine the evidence, and if after a careful consideration of it there remains a serious and well founded doubt of the defendant's guilt, leading to the belief that the verdict was not founded upon a calm and dispassionate consideration of the evidence, the

judgment should be reversed. In our judgment the evidence contained in this record is insufficient to justify the conviction of defendant. It fails to show, beyond a reasonable doubt, that the defendant was guilty of any unlawful relations with the deceased or that he caused her death.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*

CARTER, C. J., and HAND, J., dissenting.