(No. 18295.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM WHITE, Plaintiff in Error.

*Opinion filed February 20, 1929.*

W. W. O'BRIEN, and LOUIS GREENBERG, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney. General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, LEE R. LAROCHELLE, HAROLD LEVY, and EMMET BYRNE, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, William White, herein called the defendant, was found guilty of the murder of Edward Pflaume, a police officer, by the verdict of a jury fixing his penalty at imprisonment in the penitentiary for the term of his natural life. The criminal court of Cook county (the trial court) overruled his motion for a new trial and sentenced him to the penitentiary in accordance with the verdict of the jury. He has sued out this writ of error to review the record.

On the afternoon of December 13, 1925, the deceased, Edward Pflaume, and Maurice Jacobs, police officers of the village of Forest Park, James E. McBride, a police officer of the village of Bellwood, and Charles Jones, a police officer of the village of Berkley, got into a police car of Forest Park at the village of Bellwood for the purpose of seeking two men in a Chrysler automobile. The record does not disclose who were the two men for whom they were hunting. They drove to the Mannheim Inn, which is situated in Proviso township, in Cook county, on the north side of Twenty-second street, a short distance east of the Mannheim road, and is not in any one of the villages of Forest Park, Bellwood or Berkley. It was about four o'clock in the afternoon. They saw a Chrysler car parked on the east side of the Mannheim Inn, near the southeast corner of the building. They parked their car near the Chrysler car and McBride and Jacobs entered the inn at the main entrance, on the south side

of the building. They walked through the dining room of the inn and through a hallway and into the bar-room, which was north of the dining room and apparently faced the east side of the building. Pflaume and Jones entered the bar-room by the rear or bar-room entrance, on the east side of the building. At the time the officers entered the building the defendant, a man by the name of Johnson, his wife and another woman were sitting at the table in the dining room. In the bar-room there were two men and the bar-tender, who was the proprietor of the inn. When the four officers met in the bar-room Pflaume spoke to the proprietor of the inn, who went into the dining room and soon returned to the bar-room with the defendant. Pflaume asked the defendant who owned the Chrysler automobile, and he replied that it was his. The officer asked the defendant if he had anything to show that the car was his, and he took from his pocket a card showing the registration of a car in the name of William Hanley. Pflaume asked him if his name was Hanley. The defendant replied that Hanley was his name. Pflaume handed the registration card to Jones and told him to check the motor number of the car. Jones returned in a few minutes and shook his head from side to side, indicating that the number on the car did not check with the number on the card. The defendant then took from his pocket a bill of sale and handed it to Pflaume, who said to him, "Come on out and we will look at it ourselves." The four police officers and the defendant then went out to the car. The defendant raised the hood with his left hand and the officers inspected the motor number. Pflaume said to the defendant, "It is one number off." While at the car McBride grabbed the defendant's right arm and pulled his hand out of his coat pocket. It was then noticed by the officer that the first three fingers were off of his right hand, leaving only the thumb and little finger. The police officers and the defendant then returned to the bar-room. Johnson then came into the bar-room from the dining room and

went into the toilet. When he came out of the toilet Jones searched him but found no weapon and Johnson returned to the dining room. Pflaume said to the defendant: "I guess we had better check up on it; you had better get your hat and coat; we will have to take you to the station." The defendant and Pflaume, followed by McBride and Jacobs, then started into the dining room. As the defendant and Pflaume entered the door into the dining room a number of shots were fired, and after an interval several more shots were fired.

The transactions that took place immediately before and after the shooting were testified to by the witnesses in substance as follows:

Officer James E. McBride: As White, Pflaume, Jacobs and the witness were entering into the dining room White was in front and Pflaume was at his right and slightly in his rear and a little in front of the witness and Jacobs, and just as they got through the door leading from the hall into the dining room White turned and began shooting. The witness did not see White have a pistol but White was shooting through his coat. The first shot fired by White struck the witness on the right side of his face and knocked him down and he fell back into the hallway. Pflaume turned and ran through the hallway, stepping over the witness. There were about eight shots fired and then the shooting ceased. The witness then raised up and fired six shots at White and Johnson, who were running toward the front door of the inn. Johnson fell back into the doorway and the witness did not see White again that night. The witness was the man that killed Johnson. He did not know Johnson or White at that time. White had no weapon in his hand as he ran out of the front door. The witness, after he had fired his six shots, heard a few shots fired outside of the inn. He did not know who shot Pflaume.

Officer Jacobs testified: As White and Pflaume were going into the dining room he heard seven or eight shots

fired in quick succession and after an interval five or six more shots. He had started into the dining room, but someone bumped into him and he stepped out onto the back porch of the inn. In a few minutes thereafter a window on the porch was kicked out and Pflaume stepped through that window onto the porch. He and Pflaume then ran around the rear of the porch to a door on the rear veranda. Pflaume kicked "the screen door off" and he and the witness then ran off the porch to the east side of the building and then south along the side of the building. He did not know whether or not Pflaume had been shot at that time. On the east side of the building he and Pflaume separated. He saw a man who had crossed in front of the building, out by the car. Pflaume went over to the car and the witness backed up and went around the porch and looked there for a man he saw cross the front of the porch. It was pretty dark and he could not see who it was. When he saw the man the witness said, "Look out, Ed!" addressing Pflaume. After seeing the man the witness went around the building to the side but did not see anyone. He crept over to some bushes along the road and then came down to the front by the road. The car was standing on the road when he saw Jones. He did not see who went away in the car. He did not ask Pflaume whether or not he was shot when he came through the window onto the porch. Pflaume had a .38 special. McBride told him that he had a .38 that night. Jones told him that he had a .45. He never saw White in his life before that night. He never saw any of the guns that night. He did not fire any shots at all. He did not know that night that Johnson had escaped from the penitentiary.

Bertha Johnson testified that she was sitting at a table in the dining room with her husband (the man that officer McBride killed) and the other woman when White and Pflaume entered by the dining room door. She stated that as soon as the shooting started she covered her face and

did not see who fired the shots but uncovered her face just in time to see her husband fall in the front door. She said that he had just got up to take his coat, which was lying on a chair, when the shooting started. He did not have a gun that night. On cross-examination it was brought out that her husband had been confined in the Joliet penitentiary and that she had not seen him for five years before December 13, 1925.

Officer Jones was called as a witness by the court at the request of the defendant. He testified that he was in the toilet when the shooting started at the inn—that he went there to see if Johnson had left a pistol there. He stayed in the toilet until the shooting was over and then stepped outside and fired two shots at a moving figure that he took to be White. It was dark and he would not be sure that it was White. He fired no shots inside the building. He saw Pflaume walking on the outside of the building (just where does not appear from the record) and put him in a car. Johnson's body was lying in the front door of the inn, and witness found a .38 caliber pistol between the police car and the Chrysler car.

Pflaume was taken to the Edward Hines Hospital after the shooting at the inn. He died of his wounds between eight and nine o'clock P. M. of that day, December 13, 1925. The evidence shows that the bullet which killed him entered his right chest near the nipple, passed through his chest, through his liver, through his stomach and through the support of the stomach and passed out of his body below his ribs, on his left side. He also had a wound made by a bullet passing through his right thigh from the outside inward and downward and out on the inside of the thigh, just above the knee. The record does not show what was the caliber or size of the bullets that were fired into Pflaume's body. About 5:45 P. M. of that day a deputy sheriff found five empty .45 caliber automatic pistol shells on the floor in the northeast corner of the dining room of

the inn and also a steel-jacket bullet from a .45 caliber pistol. These empty shells were introduced in evidence and appeared to have been made by the Peters Cartridge Company. This deputy sheriff also found two empty .38 caliber shells in the kitchen, which were introduced in evidence. After the shooting a police officer drove the Chrysler car to the Forest Park police station. The chief of police of Forest Park searched this car about one o'clock A. M. of December 14, 1926, and found thirteen cartridges made for a .45 caliber automatic pistol. These cartridges were found under the back seat. They were introduced in evidence and appeared to have been manufactured by the Remington Company.

Plaintiff in error was arrested on March 23, 1926, in an up-stairs room in the Roadside Inn, near Chicago. At the time of his arrest he had on the floor near him two .45 caliber automatic pistols, which he admitted were his.

Plaintiff in error makes the following contentions in this court: First, that the evidence is insufficient to establish the fact that he committed the crime charged in the indictment, either as a principal or as an accessory before the fact; second, that the court erred in giving improper instructions at the request of the prosecution; third, that the court erred in refusing to give proper instructions at the request of plaintiff in error; and fourth, that the court erred in denying plaintiff in error's motion to set aside the verdict and to grant a new trial.

It is clear from the evidence in the record that the vital question of fact that was to be determined by the jury was whether or not Pflaume was killed by the defendant or by one of the officers associated with Pflaume in the attempt to arrest the defendant. It is not our purpose to discuss the evidence on the merits or to in any way indicate our views upon this decisive question. It is equally clear that this court is not warranted in affirming the judgment

because of the various prejudicial and reversible errors appearing in the record. The evidence discloses no authority on the part of the deceased, or of the other police officers with him, to arrest the defendant at the time of the shooting at the Mannheim Inn. In the brief and argument for the People there is an attempt to justify the action of the officers on the ground that he was found "with a car with the engine number defaced." The evidence does not show that the number on the motor of the Chrysler car was defaced or changed. The showing is that the motor number was not identical with the number on the registration card. That fact does not show that the number on the motor had been changed. The further showing in the record is that the defendant was not committing any offense at the time of or before the shooting, that he was a stranger to all of the officers, and that they had no authority to arrest him. The officers had no warrant or color of authority to arrest the defendant at the place where the shooting occurred. The law is, that where an officer without a warrant or color of authority is attempting to arrest a person who is not at the time committing any offense, and who kills the officer, the homicide is manslaughter and not murder unless the evidence shows previous or express malice. (*Rafferty* v. *People,* 69 Ill. 111, and 72 id. 37; *People* v. *Scalisi,* 324 id. 131.) In this case the court gave no instructions whatever on manslaughter, and refused to give an instruction defining manslaughter which was offered by the defendant. All of the instructions given by the court related solely to the offense of murder. It was reversible error to refuse to give the instruction on manslaughter, and it was reversible error, under the evidence, to give instructions as to the law of murder, as there was no evidence in the record showing or tending to show previous or express malice,—that is, a previous or express malice entertained toward the deceased, or toward the officers assisting him

in the attempted arrest, before their meeting with the defendant on that night.

In the case of *Rafferty* v. *People,* 69 Ill. 111, the court, after quoting approvingly the law on this subject laid down in Foster on Homicide, that "it is a general rule that when persons have authority to arrest or imprison, and, using the proper means for that purpose, are resisted in so doing and killed, it will be murder in all who take part in such resistance," said: "But three things are to be attended to in matters of this kind: the legality of the deceased's authority, the legality of the manner in which he executed it, and the defendant's knowledge of that authority; for if an officer be killed in attempting to execute a writ or warrant invalid on the face of it, * * * and the officer or private person be resisted or killed, the killing will be manslaughter, only." This court in that case further held that the only exception to the rule above set forth was in that class of cases in which it is definitely proved that the defendant killing the officer had entertained a previous or express malice against the officer and that the killing was the result of such express malice. This holding was expressly re-affirmed by this court in the case of *People* v. *Scalisi, supra,* decided by this court in December, 1926. In the latter case we said: "To most citizens the right of liberty is as sacred as life itself. To such an extent is this sentiment recognized that the constitutions of the United States and Illinois have attempted to safeguard the liberty of the citizen. The right to resist unlawful arrest for a misdemeanor is universally recognized. Whether the person whose right to liberty and freedom from illegal arrest is guilty of any offense when he kills the aggressor depends upon the circumstances of the case. He has no right to kill an officer who attempts to commit a trespass upon his person and nothing more, and where the arrest is made by a known officer and nothing is to be reasonably apprehended beyond a mere temporary detention in jail, resistance can

not be lawfully carried to the extent of taking life. * * *
It is the general rule in England and this country that if
a public officer be resisted and killed by a person whom he
is attempting to illegally arrest without color or authority
of law the killing will be manslaughter, only, unless the
evidence shows previous or express malice."

The several instructions of the court, under the law
above laid down and under the evidence in the record, were
not applicable to this case, to-wit: The instruction defin-
ing murder; the instructions defining malice in general,
and instructing the jury that malice shall be implied when
no considerable provocation appears or when all the cir-
cumstances of the killing show an abandoned and malignant
heart; that as a matter of law malice includes not only
anger, hatred and revenge, but every other unlawful and
unjustifiable motive; that the words "malice aforethought"
do not necessarily imply the lapse of a considerable time
between the malicious intent to take life and the actual exe-
cution of that intent; that whether the design to effect death
was formed on the instant or had been previously enter-
tained is immaterial, for the malicious killing, in either case,
is murder, etc.; and that if the evidence shows, beyond
a reasonable doubt, that the assault was committed delib-
erately and was likely to be attended with dangerous con-
sequences, the malice or intent requisite to make out a case
of murder will be presumed.

The court also instructed the jury that if the defendant
immediately fled from the scene of the killing then the jury
would have a right to take into consideration such flight in
determining the question of his guilt of murder. This in-
struction was in no way applicable to the case under the
facts proved, either in determining the question of the de-
fendant's guilt of murder or of manslaughter, for the rea-
son that a case of manslaughter, only, was established if
the evidence showed, beyond all reasonable doubt, that the

defendant killed the deceased. If he did not kill the deceased he was neither guilty of murder nor manslaughter.

The following instruction was errroneous:

"If it is uncertain from the evidence in the minds of the jury, which one of two or more persons fired the shots which caused the death of Edward Pflaume that would operate to acquit the defendant, unless there is proof beyond a reasonable doubt that the defendant aided or abetted the person whom you find from the evidence did fire the shot or shots."

There was no evidence in the case showing or tending to show that the defendant was an accessory to the killing of the deceased. The defendant fled immediately after he fired his shots, and the last person to certainly see him on that night, as is established by the evidence, was officer McBride, who testified that he shot at Johnson and the defendant as they were running toward the south door of the inn and that Johnson fell back into the inn and that the defendant "tumbled out" of the south door. If the defendant was seen there after that it was at the time that Jones thought that he shot at him on the outside of the building but was not certain that it was the defendant, and if it was the defendant he was certainly not aiding or assisting anybody else to kill Pflaume.

It was also error for the court to refuse to give the instruction offered by the defendant to the effect that it is a rule of law that although it may be positively proved that one of two or more persons committed a crime, yet if there is any reasonable doubt as to which is the guilty party the accused must be acquitted. This was the only instruction offered on that question except the one given by the court with the proviso that rendered it erroneous.

The judgment of the criminal court is reversed and the cause remanded. *Reversed and remanded.*