(No. 21072

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM WHITE, Plaintiff in Error.

*Opinion filed February 19, 1932—Rehearing denied April 8, 1932.*

THOMAS D. NASH, and MICHAEL J. AHERN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, OTHO S. FASIG, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Per CURIAM: The plaintiff in error, William White, was indicted in 1925 in Cook county for the murder of Edward Pflaume, a police officer of Forest Park. White was tried, convicted and sentenced to the penitentiary for life. Consideration by this court of his first conviction re-

sulted in a reversal and remandment. (*People* v. *White,* 333 Ill. 512.) The mandate of this court was filed in February, 1929, and White was freed from custody and his surety released. About fifteen months after his discharge from custody, in October, 1930, White was again arrested on the same charge, the chief justice of the criminal court on his own motion having reinstated the People's case against him. White was again indicted for the killing of Pflaume in the very language of the first indictment. He was tried, found guilty of murder and sentenced to the penitentiary for fourteen years. He is again before this court assigning numerous errors, but the consideration of only two is necessary for a proper disposition of the case. These two assignments are: (1) That there is a reasonable doubt upon the record of the guilt of White, in that the evidence does not show beyond a reasonable doubt, or otherwise, that he shot and killed Pflaume or that he aided and abetted any other person to do so; and (2) that the trial court committed error in admitting evidence of all transactions, events and circumstances relating to the robbery of the West McHenry State Bank on October 24, 1925. This second objection also was intended to cover the robbery of a truck driver named Joyce on December 13, 1925, in Forest Park, on the same day and a few hours before Pflaume was shot.

We do not deem it necessary in this opinion to re-state the facts contained in *People* v. *White, supra,* as the statement of facts therein has been adopted by the defendant, White, in his brief. All material and pertinent changes of or additions to those facts which were brought out in the second trial will be considered and incorporated herein at their proper places.

This court said in *People* v. *White, supra,* at page 518: "It is clear from the evidence in the record that the vital question of fact that was to be determined by the jury was whether or not Pflaume was killed by the defendant

or by one of the officers associated with Pflaume in the attempt to arrest the defendant." In that opinion this court stated that it would not discuss the evidence on the merits or in any way indicate our views upon this decisive question. The condition of the record in the present case does make it necessary for us to deal with the evidence upon its merits in order to determine the vital question, Did White kill Pflaume?

A comparison of the facts in *People* v. *White, supra,* with the evidence brought on the second trial discloses the following ultimate facts: When the four officers arrived at the road house late in the afternoon of December 13, White and his woman companion and Johnston and his wife were all seated at the same table, north of the middle of the east wall of the dining room. In the dining room each man had an overcoat but was not wearing it. As the four officers and White returned from an inspection of the Chrysler car and entered the bar-room Johnston was just emerging from the men's toilet room. Officer Jones at once searched Johnston but found no weapon upon him. Jones then entered the toilet room in order to ascertain if Johnston had there secreted any weapon. When White was told that he would have to accompany the officers he started for the dining room to get his overcoat. This required him to pass through the doorway from the bar-room to the hall. He was followed closely by officers Pflaume and McBride and by Vanicek, the bar-tender, who was curious to see what was happening. As White and Pflaume were at the junction of the hall and the dining room Pflaume searched White. This search, according to Vanicek, consisted of feeling over White's trouser pockets, coat pockets, armpits and chest. Vanicek claimed that he was first behind Pflaume, while McBride, according to Vanicek, was almost opposite him and to his right when they were in the hall. When White and Pflaume entered the dining room immediately after this search Vanicek said

that he heard shots coming from the direction of the table at which Johnston and the two women were seated. Although he could not see the table he said he could see White when the shooting commenced, and that White did not shoot nor did he have a gun in his hand. Vanicek then fled to the safety of the kitchen. From there he heard more shooting and the crash of a window. Someone yelled that he was shot, but Vanicek said he did not know who it was. When he turned and ran down the hall to the kitchen by way of the bar-room he bumped into someone, but he said it was not Pflaume. Vanicek later retreated to a bed-room, where he heard the crash of a screen door in the back of the building. A few minutes later he saw McBride in the pantry, loading his gun.

McBride's testimony differs from Vanicek's by saying that the latter was not following him at all but remained in the bar-room as White, Pflaume and McBride entered the hall. McBride said that he did not search White and that he did not see Pflaume search him. According to McBride, White did the shooting. He related how Pflaume crouched, turned and ran down the hall to the north, although he had not mentioned his crouching in the first trial. He was down on the floor when he says he observed Pflaume, and was shooting at Johnston. When he got up, he went, according to his version, to the doorway between the pantry and kitchen, where he stayed for some time. On cross-examination he said he thought White was searched after Johnston was searched; that he did not know who shot Pflaume; that while he was on the floor, shooting at Johnston, Pflaume jumped over him and ran out towards the back; that he heard him say he was shot but did not hear him break any window. He had no recollection of having told at the coroner's inquest that Pflaume said he was shot as he fled down the hall. He further testified that if there had been a 45-caliber gun in White's left pocket while all were at the Chrysler car he would have

seen it, and that White did not have a gun in his right pocket at that time. McBride said that from the time all the officers and White were at the cars, until the shooting, White was under the surveillance of the officers and was not out of the sight of Pflaume and himself. What Pflaume did or said from the time he fled from the hall during the shooting until twenty-five minutes later McBride did not know.

Up to this point we have the stories of the only witnesses to the shooting inside the road house, with the exception of White. The story told by the widow of Johnston possesses little merit, since she said she covered her head when the shooting started and saw nothing of it. Neither Vanicek nor McBride states positively that Pflaume was actually shot while in the road house, in so far as his own knowledge about the matter extends.

Officer Jacobs saw White, Pflaume and McBride go into the hall toward the dining room. He does not directly include Vanicek in the party but does do so inferentially, for he said Vanicek bumped into him as he was trying to get into the hall from the bar-room. Jacobs then saw someone pass him and go on down the hall but could not identify him. Jacobs then went through the bar-room to the east or side porch of the road house and stood behind the door leading to the bar-room. While there he heard the crash of a window back of him. He looked around and saw Pflaume crawl through the window after kicking out all the glass. According to Jacobs, Pflaume asked to be taken to a hospital. Then, Jacobs said, they both went to the back of this porch and Pflaume kicked out the screen door at the west end of this porch. From there they came east to the northeast corner of the road house porch and then came south past the south end of this side porch. Jacobs then saw someone near the cars, which were south of them a short distance, and he yelled to Pflaume to look out. Thereupon he said that he and Pflaume went in different

directions, he going back around the road house and coming down its west side towards the front of the building, while Pflaume, when last seen by him, was continuing on south toward the road, about fifteen or twenty feet from the side of the road house. At the time Jacobs got his last glimpse of Pflaume he said he saw an unidentified person run away from the cars and around the front of the road house. Jacobs said he did not fire a shot at any time that night. When he got around to the front of the road house he saw Jones, and in response to his query Jones told him that he had put Pflaume in a car and sent him to a hospital. When Jacobs inquired about the unidentified man out in front Jones did not know where he went, although he said he had shot at some dark object a minute before and "he had him down there." The two looked around but did not find the unidentified man nor did they find White at that time.

When the shooting started in the road house officer Jones was in the men's toilet room hunting for a gun Johnston might have secreted in there, so he could not tell what happened. He said all was in confusion. He came out of the building at once by means of the bar-room door leading onto the east porch, which is also called the side porch and the back porch. Jones placed himself back of some bushes to the east of the building in such a position that he was screened from view but could cover the front entrance, the bar-room door on the east and the two cars parked at the corner of the building. He stated that it was dark, which agrees generally with what was said by others concerning the amount of light. The weight of the evidence was that it was dark enough to make it difficult to see objects clearly. Jones said that as he came down the steps leading from the side porch near the bar-room door he heard a crash of glass on the porch north of the bar-room door. He looked around and saw Pflaume and Jacobs. He went on and took his post behind the shrub-

bery and said he did not see Pflaume again until after he had shot at the dark object near the car and then found Pflaume, wounded, trying to start the car. Jones said it was only a short interval between the time when he saw Pflaume and Jacobs on the porch and when he sent Pflaume away. After getting behind the shrubbery he said he looked towards the cars and saw a dark, moving object. At this object he fired several shots, and after waiting a short time he advanced toward the cars and then saw Pflaume trying to start one of the cars. Jones then helped him to the street, put him in a passing car and sent him to the hospital. On cross-examination he testified: "I don't know whether I shot Pflaume or not; I shot over near that spot." One phase of Jones' testimony is strongly corroborative of what Vanicek said. Jones said when he came out of the men's toilet he tried to get into the hall but could not, as Vanicek at that time came rushing out of there.

Coming, now, to a consideration of the evidence dealing with the different fire-arms carried by the officers we find this: Pflaume had a 38-calibre revolver, Jones a 45-calibre automatic pistol, McBride a 38-calibre revolver, while Jacobs used a 32/20 revolver. Two 45-calibre automatic pistols were found near White when he was arrested some time after the shooting. The same evening that the shooting took place an officer on guard at the road house found some empty cartridge cases of 45-calibre and a spent 45-calibre bullet. A comparison of these cartridge cases and spent bullet with the cases and discharged bullets of cartridges fired from the two pistols found with White failed to establish that either of White's pistols was used at the road house. For some unknown reason Jones could not find the 45-calibre gun with which he shot at the unidentified man who was at the cars. Pflaume was mortally wounded by a bullet from a 45-calibre gun, and Jones was the only police officer who had one of that size. Not one witness was able to say that he saw a gun in the hands of

White during all the time the officers were at the road house. Only one man said that White did the shooting. · That was McBride. His testimony is weakened by the fact that he did not see any gun on White and that he knew White did not have a gun in the side pockets of his coat. White was never out of the sight of some of the officers until after the shooting. There is emphatic proof that he was searched by Pflaume. Even McBride said he supposed White was searched right after Johnston, but the latter, after his search, again seated himself at the table with the women. A greater degree of substantiation is given to the version of affairs as related by Vanicek than is given to the story told by McBride. The proof corroborates Vanicek's testimony that the shots came from the vicinity of the table and not from White, and that White did not raise his arm when the shooting commenced but was walking toward the table from which the firing came. Vanicek, a tailor by trade, stated that he noticed that White's coat had patch pockets, the coat being what is called a "sport coat," and that those pockets did not contain a gun, for if a gun had been in a pocket of that character it would have been noticeable. White was searched and no gun found upon him. He had no opportunity to get a gun after his search, as the police were with him constantly until the shooting began. By the greater weight of the evidence it is shown that the shots came from the direction of the table where Johnston and the two women were sitting. The police officers had not searched the two overcoats in the dining room nor had they searched the two women. The widow of Johnston said that he did not have a gun that day, but she failed to state how she knew this to be a fact, as she had only met him that afternoon after a separation of five years. She did not see who did the shooting, and the other woman did not testify, as she could not be found. When the 45-calibre cartridge cases were found in the dining room after the shooting they were in the northeast

corner of the room. The 45-calibre bullet was on the floor in the adjacent hallway. The officer who found these cases and bullet testified that there were bullet holes or marks on the west wall of the hallway. This plainly showed that the bullets came from an easterly direction—that is, from the east side of the dining room and close to the northeast corner. This supports the story of Vanicek that the shots came from the direction of the table where Johnston and the two women were sitting.

When it comes to a consideration of the matter of someone yelling that he was shot we encounter some discrepancies and inconsistencies in the evidence which cannot be reconciled. It is strange that McBride did not state at the first trial that Pflaume said he was shot and that he did not mention it at the second trial until in one of his cross-examinations, although he went over that portion of his testimony several times. From the inconsistencies found by a comparison of his testimony at the second trial with what he said at the first trial and at the coroner's inquest it is apparent why he was made a witness of the court and not vouched for by the State. The most charitable thing that can be said about this witness is that so much happened around him in such a short space of time that his mind could not register a lucid, accurate impression of happenings or their proper sequence.

Officer Jacobs said that Pflaume asked to be taken to a hospital when he crashed through the window onto the side porch. Jacobs admitted, however, that Pflaume gave no indications at that time of having been shot. He said Pflaume did not limp or stagger and was able to move about at a slow trot and to use his legs in kicking off the screen door of the porch, and that Pflaume kept ahead of him all this time. Pflaume suffered from two wounds, one of them being fatal while the other could be only characterized as serious. The State has failed to establish beyond a reasonable doubt that Pflaume suffered either or

both wounds while inside the road house. This failure leaves open the reasonable possibility that he received one or both wounds from shots fired outside of the road house. The uncontroverted testimony of Jones is that he was about fifteen feet away from Jacobs and Pflaume on the porch, and that he did not hear any request of Pflaume that he be taken to a hospital or that he was shot. When Jacobs called the warning to Pflaume, Jones was secreted in the shrubbery to the east of the two men and south of them. He did not testify that he heard any warning from Jacobs to Pflaume. At this time, according to Jacobs, the two men were fifteen or twenty feet east of the road house. After he received the warning from Jacobs Pflaume went toward the two cars which Jones was watching from his place of concealment. It is not disputed that some person was seen around the cars. Jacobs saw him there and saw this person go to the front of the road house. It is quite possible that Jones did not see this unidentified person, who was first seen by Jacobs, but did see Pflaume when he later approached the cars in the darkness. In any event, Jones shot at what he saw and in a short while went over and found Pflaume. His own testimony is that he did not know whether he shot Pflaume or not—that he "shot over near that spot."

The evidence in this case is altogether circumstantial and highly conflicting. When it is, and a reasonable hypothesis can be arrived at on the theory of the defendant's innocence, the defendant should be freed. (*Mooney* v. *People,* 111 Ill. 388; *Purdy* v. *People,* 140 id. 46; *People* v. *Ahrling,* 279 id. 70.) On the record there is reasonable doubt that White was guilty of killing Pflaume. The evidence does not establish beyond a reasonable doubt that he shot and killed him or that he aided or abetted any person to do so. Under such circumstances this court has not hesitated to reverse a conviction. (*People* v. *McMahon,* 254 Ill. 62; *People* v. *Jones,* 313 id. 335.) While this

court is committed to the doctrine that the jury in their deliberation are judges of the facts and of the weight of the evidence in criminal cases, still this court will reverse a judgment of conviction where the evidence on which it is based was of such unsatisfactory character that after a full consideration there remains such grave and serious doubt of the guilt of the accused as leads to the conclusion that the verdict of the jury was the result of passion or prejudice. *People* v. *Ahrling, supra.*

This court, in reversing the judgment and remanding the case of *People* v. *White, supra,* said that where an officer without a warrant or color of authority is attempting to arrest a person who is not at the time committing an offense, and who kills the officer, the homicide is manslaughter and not murder. In an endeavor to show that Pflaume was acting under color of authority in arresting White the State introduced evidence at the second trial to show the happening of the two robberies previous to the killing at the road house. That the robberies were committed is unquestioned. When the State endeavored to show that White was a participant in either one or both of those robberies it introduced incompetent evidence, and the court erred in allowing it to go to the jury. Joyce's robbery occurred approximately an hour and a half before Johnston, White and the two women appeared at the road house. The officers did not have a description of the two men who held up Joyce. All they knew was that the car used was a dark-colored Chrysler touring car with side curtains. It is very apparent that the officers, from what they said at the first and second trials, were not looking for White and Johnston in connection with the Joyce robbery. Neither Johnston nor White was questioned by any of the officers concerning the robbery of Joyce. There is no evidence in the record that Joyce ever identified White, after his arrest, as one of the men who robbed him. Comparison of the testimony at the second trial with what the officers said

at the first trial shows that when the officers stopped at the road house they were searching for the stolen Chrysler car. The careful examination of the numbers on White's car is ample proof of this. Furthermore, White was told that he would be taken to the station because Pflaume was not satisfied that the numbers on White's car had not been changed or defaced. No reasonable ground existed on which the officers could base an honest belief that White was the perpetrator of the felony upon the person of Joyce. The proposition of the State that the numbers on the Chrysler had been defaced or were otherwise irregular, is not borne out by the evidence and merits no further discussion. What this court said in *People* v. *White, supra,* in that connection fully covers that point.

When we come to consider the matter of the robbery of the West McHenry State Bank and the alleged connection of White therewith it is not necessary that we go into a detailed discussion of the evidence produced at a second trial. Much of the evidence introduced was clearly inadmissible, and its admission would be ample ground for reversing this case if for no other reason. The evidence properly admitted, when considered and compared with all the other evidence, can lead to but one conclusion: that the State, while showing the commission of the bank robbery, has failed to connect White therewith, and Pflaume did not have the authority to arrest White on the bank robbery charge. The three cardinal conditions as laid down in *Rafferty* v. *People,* 69 Ill. 111, attendant upon a lawful arrest, are: (1) The legality of the deceased officer's authority; (2) the legality of the manner in which he executed it; and (3) the defendant's knowledge of that authority. These conditions were not fulfilled in the present case. The admissible evidence is not sufficient to establish the first two conditions; and there is absolute failure of the record to show that the officers, or any one of them, ever acquainted White with any reason for his arrest other

than the irregularity of the numbers of the Chrysler car. In the State's endeavor to connect White with the bank robbery and to show that he was arrested for the robbery the trial court admitted in evidence certain statements made by third persons against White in his absence and without his knowledge.

For the reasons assigned, the judgment of the criminal court of Cook county is reversed and the cause remanded.

*Reversed and remanded.*