## DAVIS *v.* STATE

[No. 58, October Term, 1953.]

*Decided February 11, 1954.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Herbert R. O'Conor, Jr.,* with whom were *O'Conor & McManus* on the brief, for the appellant.

*W. Giles Parker, Assistant Attorney General,* with whom were *Edward D. E. Rollins, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City, M. Peter Moser, Assistant State's Attorney,* and *James F. Price, Assistant State's Attorney,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellant, a fifteen year old boy, was convicted by a jury in the Criminal Court of Baltimore City of assault with intent to murder. His appeal relies on the claim that the trial court erred in refusing to charge the jury that to convict, it must find the existence of malice, or in other words, must find that if death had followed the assault, the crime committed would have been murder and not manslaughter.

The State produced testimony which showed that on a February afternoon, Tommy Davis, the appellant, with his brother and another boy, went to the movies and then to a vacant lot to shoot a pistol Tommy had had for three weeks but had never fired. Tommy, described as "a seriously maladjusted and warped . . . individual" with poor control of his "anti-social hostile impulses", and as one who reminded you "of a wandering dog that had been severely beaten", carried the pistol because, in his words, he felt he had "a little power" behind him with a gun and did not have "to take a lot of stuff off a lot of people". His intelligence is normal and in the eye of the law, he is a responsible agent.

The boys went into an East Baltimore back yard to get coats two of them had left there earlier in the day. Sergeant Urban of the Baltimore police, off duty and not in uniform, noticed the boys. Thinking they were

runaways, he questioned them. He described their answers as not "entirely satisfactory" and says he decided to take them to the station house. When he was asked if there was any other reason he felt justified in detaining them, he said that it was their appearance, they were unkempt and dirty. The yard belonged to a Mrs. Fallon, whose teen-age daughter, Evelyn, had come into the yard with Sergeant Urban. Mrs. Fallon then appeared. She said the boys were dirty and "messed up" looking, and had not had a haircut for months. The Sergeant asked her what she desired, saying, as she put it: ". . . it was entirely up to me what I wanted to do. . ." She decided to have the police investigate and went to a neighbor's to call them. After she left, Sergeant Urban showed the boys his police badge and told them to sit down. They were standing about five feet from the house, he about ten feet inside the yard in front of the gate to the alley, which left some ten feet between them. Tommy said to the others: "Let's get out of here", and pulled out the pistol. Sergeant Urban, seeing this, ran or lunged toward him and says the boy "fired a shot point-blank" at him. The sergeant then deflected the gun so that a second shot hit the ground and ricocheted, hitting Evelyn Fallon in the knee. The first shot struck the Sergeant grazingly, ran along the chest wall and broke his arm. The boys had run towards the gate and there the Sergeant released his grip on Tommy, because of his wound. All escaped and were later arrested. Tommy said in his statement to the police that he told Urban to get out of the way and fired at the ground to scare him so that he would. When the man started towards him, "I shot him in the belly" because he wouldn't get out of the way.

The testimony produced on behalf of the appellant included the following—Tommy had never been in the yard before and did not know whose it was. The boys went in only to get the coats. When they told Sergeant Urban this, he called them little liars and accused them

of trying to break in the house. He did not believe Urban was a policeman but when Mrs. Fallon went to call the police, he got scared, because he was on probation and feared being found with the pistol and being accused of breaking into the house, so he decided: "I wasn't going to stay there" and would not sit down when Urban told him to. Tommy told Urban to get out of the way. He did not move so Tommy shot at the ground to scare him, and told him to keep back. When Urban came towards him, Tommy says he hit him with the second shot. One of the other boys says it was the third shot, the first two being towards the ground. Urban admitted that he had told an Assistant State's Attorney and Tommy's counsel at the hospital that it might have been the second or third shot that hit him. Tommy says he never intended to kill or murder Urban—he only intended "to get out of there", and shot with the idea of stopping Urban. He did not think of killing him. He also said in response to a suggestion that it was the job of the police to arrest people, that Sergeant Urban didn't arrest him because "he wasn't able to." When asked if he thought Tommy intended to kill him, Urban replied: "He said he wanted to get out of there."

The appellant had presented five prayers. The court's original charge to the jury was very brief and included none of the requested instructions. The jury was told it was the judge of law and fact, the instructions advisory only. The state must establish guilt beyond a reasonable doubt. Credibility of witnesses is for the jury. Duty must be done "regardless of how distressing you may feel it is to the individual who stands . . . before you." This was all. At the urging of the appellant, the court then added to its charge the substance of two of the prayers, namely, that to find a verdict of guilty of assault with intent to murder, there must be ". . . a felonious intent which occurred at the same time" and that the state must prove satisfactorily all the elements of the crime.

The three other instructions sought by the appellant and refused by the court, were, in substance:

1. The circumstances must be such that if death had resulted, the homicide would have been murder and, in addition to this, there must be the specific intent to murder.

2. If the assailant acted without malice aforethought, the verdict of the jury must be not guilty.

3. To find a verdict of guilty of assault with intent to murder, the circumstances must be such that if death had resulted, the homicide would have been murder, and that an assault is not an assault with intent to murder if the actual killing would be manslaughter only.

We think the court was right in refusing to grant the first of the three prayers, but that it erred to the prejudice of the appellant in not instructing the jury that the applicable law was substantially as set forth in the second and third. Rule 6 (b) of the Criminal Rules of Practice and Procedure says that at the request of any party, the court: ". . . shall grant such advisory instructions to the jury as may correctly state the applicable law". Paragraph (g) of Rule 6 makes it plain that failure to give requested instructions shall be considered by this Court on appeal. *Hendrix v. State,* 200 Md. 380; *Madison v. State,* 200 Md. 1; *Wright v. State,* 198 Md. 163.

The appellant said at the argument that the first prayer was intended to, and did mean, that the law is that there can only be assault with intent to murder if there existed a specific wilful, deliberate and premeditated intent to kill. The prayer meant to instruct the jury that it could convict only if it found that, had death resulted, the homicide would have been murder in the first degree. This is not the law. In *Webb v. State,* 201 Md. 158, we affirmed the conviction of assault with intent to murder on the conclusion that there was evidence which justified a finding of the existence of malice, so that, if death had followed the assault, the crime would have

been murder. It was there said: "For present purposes we need not consider whether, had death ensued, the appellant could have been convicted of murder in the first degree for a 'wilful, deliberate and premeditated killing', or merely of another 'kind of murder' comprehended in the second degree. It is sufficient to state that we think the evidence supports a finding of malice." *Beall v. State,* 203 Md. 380. The clear weight of authority is that the assault must have been committed under circumstances such that, if death ensued, the crime would have been murder in either the first or second degree, it being immaterial which. In *Redd v. State* (Ala.), 165 So. 409, it was held that the charge which stated this as the law and required a finding of intent, was correct. The court said that other requested charges were properly refused: ". . . as they were based on the specific intent to kill Ed Jackson. Although the word 'specific' was not used in the requested charges, they required the jury to find that defendant *specifically* intended to kill Ed Jackson, before they could convict." The court found that the requested charge was properly refused. In *State v. Litman* (Conn.) 138 A. 132, the contention was made that the charge of assault with intent to murder required proof of premeditation and intent to kill. The court said: "Premeditation is one of the elements of first degree murder, but need not be established to prove second degree murder" and said that the intent need only be such that, if death had ensued, the crime would have been murder in the second degree. In *State v. Buchanan* (Idaho) 252 Pac. 2d 524, the court below had instructed the jury that before it could find the defendant guilty, it would have to find him guilty of premeditation. The court held that although there were two degrees of murder, there was only one crime of assault with intent to commit murder, and said: ". . . nor is premeditation an essential ingredient thereof . . .", so that the charge below, requiring the jury to find more than the defendant was entitled to, was not prejudicial. See also

*Harvell v. State* (Fla.) 20 So. 2d 801; and *Johnson v. Commonwealth* (Va.) 115 S. E. 673.

*Webb v. State,* *supra,* reiterated the established rule that to support a charge of assault with intent to murder, there must be proven not only the assault but also the intent, an essential element of the crime—the intent to do that which would be murder in either the first or second degree if the one assailed should die. Since malice is an essential element of the crime of murder, and without it a homicide is, at most, manslaughter, we have no doubt that the appellant was entitled to the requested instructions as to the necessity of finding by the jury that the crime would have been murder if the policeman had died, and so, of a finding of malice. *Chisley v. State,* 202 Md. 87, defined malice and it is apparent from that definition in the context in which it is found, that in the absence of justification, excuse or some circumstance of mitigation, malice exists not only when there is an actual, express intent to kill, but may be inferred when there is an intent to do or inflict great bodily harm, or when one wilfully does an act or wilfully fails to do a duty and the natural tendency of the act or failure is to cause death or great bodily harm.

Since intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence. Malice and, so intent to murder, may be inferred from all the facts and circumstances of the occurrence. The deliberate selection and use of a deadly weapon directed at a vital part of the body is a circumstance which indicates a design to kill, since in the absence of evidence to the contrary, the law presumes that one intends the natural and probable consequences of his act. *Chisley v. State, supra,* at p. 105 of 202 Md., and cases there cited. *State v. Litman* (Conn.), supra; *Redd v. State* (Ala.) *supra; Harvell v. State* (Fla.), *supra; People v. Herbert* (Ill.) 172 N. E. 740; and *People v. Carter* (Ill.), 102 N. E. 2d 312. In the *Webb* case, we said that:

"Neither can the intent be established as a matter of law from the mere use of a deadly weapon." If, however, the use of the deadly weapon directed at a vital part of the body is shown, this is a fact, not a presumption of law, which, in the absence of mitigating circumstances, permits the inference that, as another fact, malice existed. The *Webb* case points this out, saying that the character of the assault and the use of the deadly weapon are factors to be considered. *Wharton, Criminal Evidence,* 11th Ed., Sections 82 and 130.

Plainly the evidence introduced by the state was sufficient to justify a finding by the jury that the assault was with intent to commit murder. Yet the evidence is also sufficient to have justified a finding that malice did not exist, so that the killing, if death had ensued, would have been manslaughter. This could have been found on either of two points; one, the direct evidence of intent by the appellant himself; and the other, the fact that the shooting occurred in resisting an illegal arrest.

As to the first point, Tommy testified flatly that he did not intend to kill the policeman, but merely to scare him, and that prior to the scuffle, he shot only at the ground. His sole intent, he claims, was to escape. The competency of the accused to testify as to his intent is generally recognized, as *Webb v. State,* supra, noted. If the jury had been instructed as to the necessity of proof of malice, it might have looked at the testimony of Tommy and his friends (with such slight corroboration as came from the testimony of Sergeant Urban, that all Tommy said was that he wanted to get out of there) in a different light.

On the second point, Tommy and his companions were neither accused nor suspected of the commission of a felony and had committed no misdemeanor in the presence of Sergeant Urban or Mrs. Fallon. The reason given for their detention and the attempt to arrest them, is that they were dirty and unkempt—scarcely the basis for a legal arrest. In *Sugarman v. State,* 173 Md. 52,

57, it was held that the policeman, in making an illegal arrest, was acting contrary to his duties and: ". . . such conduct can only be regarded as a trespass against the person whom he illegally arrests. To accept any other view would afford members of society no protection whatever against an illegal arrest, merely because an officer entertained some suspicion as to their conduct. The authorities seem in accord that one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary." One may use only reasonable force with impunity and, further, if more than reasonable force is used and death results under circumstances which otherwise would be murder, the grade of the homicide is, say some courts, and may be, say other courts, reduced to manslaughter, because the killing was in resistance to an illegal arrest. The appellant makes no claim that only reasonable force was used, but does claim that the illegality of the arrest eliminates murder from the picture and so eliminates intent.

There are two major lines of judicial reasoning in case of a killing in resisting an illegal arrest. One says that once the illegality of the arrest is established, the degree of homicide cannot be greater than manslaughter unless express malice is proven. This is said to be the view of the English courts. *Wharton's Criminal Law*, 12th Ed., Sec. 542; *Law of Homicide, Moreland*, p. 78; and Dickey, *Culpable Homicide in Resisting Arrest*, 18 Cornell Law Quarterly, 373, 380. It is also the rule of some of the states. *Commonwealth v. Carey*, 66 Mass. (12 Cush.) 246; *People v. White* (Ill.) 165 N. E. 168. See 8 *Md. L. R.*, p. 57, 58. Other courts reach the same result by a rationalization that an illegal arrest is such an affront to the ordinary citizen that it is to be conclusively presumed that there is aroused in him a passion amounting to exculpatory provocation. The fundamental reason for the result reached, either with or without rationalization, is that a wise and sound social policy requires the protection of the liberty of the citizen against

the unlawful enforcement of the law, as the *Sugarman* case indicates.

The second major line of cases recognizes the wisdom and necessity of the social policy but refuses to permit a reduction of the grade of the homicide to come about automatically. These cases apply a subjective standard and hold that the accused must in fact have been filled with passion aroused by the illegal arrest sufficient to meet the usual provocation tests, if murder is to be reduced to manslaughter. The courts following this line usually classify illegal arrest with sudden combat, assault and battery upon one's person, and the sight of one's wife in the act of adultery, as the standard situations in which a homicide arising out of the agitation stirred up in ordinary men by them will be manslaughter, rather than murder. *Bishop on Criminal Law*, 9th Ed., Vol. 2, Section 699, paragraphs 1 and 2; *Law of Homicide, Moreland, supra*, p. 81; *Culpable Homicide in Resisting Arrest, supra*, p. 384, *et seq.*; 8 *Md. L. R., supra*, p. 58; *Calvin v. State*, 46 Tenn. 283, 291-292; *Sanders v. State* (Ala.) 61 So. 336; *Mullis v. State* (Ga.) 27 S. E. 2d 91, 98-99; *Alday v. State* (Fla.) 57 So. 2d 333; and *State v. Kuykendall* (N. Mex.) 19 P. 2d 744, 746; *John Bad Elk v. United States*, 177 U. S. 529, 44 L. Ed. 874; *Hochheimer's Criminal Law*, Sec. 33.

In our view, the rule just discussed best serves the sound and necessary balance between the right to freedom of the citizen and the duty of those who must enforce the law, and is the rule to be followed. In this case, the appellant was entitled to have the jury decide whether the shooting was a result of passion or sudden heat agitated in him by the provocation of the illegal arrest, or whether it was with malice; if the former, there would be no intent to murder; if the latter, such intent could follow the inference of malice.

The indictment charging assault with intent to murder Sergeant Urban was number 995. The appellant was convicted also on indictment number 994, for simple assault on Evelyn Fallon, and on indictment number

996, of carrying a concealed, deadly weapon. The appeals from the judgments and sentences in the last two cases were not pressed in brief or argument. We find nothing to indicate that they should not both be affirmed.

*Judgments in numbers 994 and 996 affirmed, and judgment in number 995 reversed and case remanded for new trial.*