(No. 41622.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* JOHN M. BRANION, JR., Appellant.

*Opinion filed Oct. 7, 1970.—Rehearing denied Dec. 3, 1970.*

KLUCZYNSKI, J., dissenting.

Howard T. Savage, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield, and Edward V. Hanrahan, State's Attorney, of Chicago, (James B. Zagel, Assistant Attorney General, and Elmer C. Kissane and Michael D. Stevenson, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Burt delivered the opinion of the court:

After a trial by jury in the circuit court of Cook County, Dr. John M. Branion, Jr. was found guilty of the murder of his wife, Donna, and sentenced to a term of not less than 20 nor more than 30 years. He brings this direct appeal alleging violation of his constitutional rights. Defendant's basic contention on appeal is that there was insufficient evidence to justify the verdict, and since the evidence was largely circumstantial, it will be necessary to set forth the principal evidence, almost entirely that of the State, in some detail.

Mrs. Donna Branion, wife of defendant, was murdered in her home at 5054 S. Woodlawn Avenue, Chicago, during the late morning of December 22, 1967.

She had spoken on the telephone to her sister, Mrs. Joyce Tyler, twice that morning, at about 8:30 A.M. and again at about 10:15 A.M., discussing baby-sitting, among other things, and at those times decedent spoke normally and was apparently not agitated about anything.

At 11:05 A.M. Mrs. Theresa Kentra, a neighbor who lived at 5056 S. Woodlawn and whose apartment shared the back porch with the Branions, came home from a shopping trip. She proceeded to put away groceries and stated that sometime later (about 20 minutes) after she arrived home she heard a loud sound followed by two or three similar sounds and then a commotion of some sort. The time was then about 11:30 A.M. Mrs. Kentra stated that 15 or 20 minutes after she heard these sounds, she observed

the defendant, Dr. John M. Branion, Jr., come out of his apartment onto the back porch, at which time he yelled for "Helen". Just prior to Dr. Banion's coming out to the porch, Mrs. Kentra saw the defendant's face and he did not appear to be agitated.

Officer William Catizone testified that about 11:58 A.M., while on patrol in the area, he received a call to see Dr. Branion regarding his wife. Upon arriving at the Branion apartment, he found the body of Mrs. Branion in the utility room. The officer went directly to the body to see if there was any pulse, but there was none.

Officer Alvin Kerston, assigned to the mobile unit of the crime laboratory, searched the area of the body and recovered three expended bullets and four cartridge casings. Two of the pellets were under the body and one near it. A fourth was later found in the body at the autopsy.

The defendant told Detective Michael Boyle, investigating the crime, that he had left his office at Ida Mae Scott Hospital, 5027 South Prairie, by 11:30 A.M. From the hospital, the defendant said he drove to the Hyde Park Neighborhood Club, 5480 South Kenwood, to pick up his son who was enrolled there. The defendant claimed that he arrived at 11:35 A.M. and that when he arrived, his son was out in front. However, Mrs. Joyce Kelly, an assistant teacher at the club, testified that she distinctly remembered seeing the defendant enter the Club between 11:45 and 11:50 A.M. and that his son was not outside but rather in the all-purpose room waiting for his father. She also remembered seeing the defendant help his son on with his jacket.

Dr. Branion told the police that after he picked up his son he drove to 1369 East 53rd Street to pick up Maxine Brown who was to have lunch with Branion and his wife. Mrs. Brown testified that the defendant had called her between 10:00 and 11:00 P.M. the previous night to make the luncheon engagement and that this was the first time he had ever called her to have lunch since the time she had begun

working in September of 1967. Mrs. Brown also stated that when he stopped for her she could not keep the luncheon engagement because of a business commitment and that the defendant and his son then left. The defendant also told the police that after he left Maxine Brown he returned home, went into his apartment and observed his wife, Donna Branion, lying on the floor in the utility room off the kitchen. He stated he flicked the light in the utility room on and off, but did not go near his wife's body because he could tell she was dead as he had observed lividity in her legs, and that he then went through the kitchen to the back door, which he opened, and ran out on the porch yelling for Helen. It was stipulated at the trial between the State and the defense that if Dr. Helen Payne were called to testify, she would state that she pronounced Donna Branion dead at 12:20 P.M. on the 22nd day of December, 1967, and that lividity was not present in Donna Branion's body, contrary to the defendant's stated reason for not going over to the body.

It was further established, through the testimony of Dr. John Belmonte, that Mrs. Branion died as a result of four gunshot wounds to the head, neck and shoulder. Three pellets were found under the body and one found in her arm. Four expended cartridge casings were found next to the body. A firearms expert from the Chicago Police Department Crime Laboratory, Officer Burt Nielsen, stated that the four pellets "had a class characteristic of .380 caliber automatic ammunition with six lands and grooves with a right twist". Lands are the raised portions inside the barrel of a gun and the grooves are the spaces between the lands. They are spiral and impart the spin motion to the bullet. As the bullet passes through the barrel it is engraved with markings of the lands and grooves. This characteristic is the same as that found in a Walther PPK and a few other weapons, he said. The cartridge casings, however had markings on their bases which signified that the weapon used to

fire the cartridges had a "loading indicator." The expert testified that only one weapon which fires .380 caliber automatic ammunition has both a loading indicator and leaves six lands and grooves to the right on the pellets. That weapon is a Walther PPK. It was his opinion, taking the pellets with the lands and grooves together with the cartridge casings with the loading indicator markings, that the deceased must have been killed by bullets fired from a Walther PPK.

The evidence also showed that when asked by Detective Moyle if he owned any weapon capable of firing .380 ammunition, the defendant said he had only one and gave the police a .380 Hi Standard. He made no mention of a Walther PPK. He also told the police that nothing was missing from his apartment. The murder weapon was never found. The evidence further showed that in February, 1967, the defendant received a Walther PPK from a friend, William Hooks, as a belated birthday present along with a brochure, a manufacturer's target, and an extra clip. During the trial, evidence was introduced that on January 22, 1968, Detective Boyle and his partner, armed with a search warrant, searched the home of the defendant at 5054 South Woodlawn and found a brochure for a Walther PPK, an extra clip and a manufacturer's target which bore the number 188274, the same number as the gun given to the defendant by his friend as a present. These items were found in a cabinet which had been locked on the day of the crime.

A month later in their investigation, armed with a search warrant, the police officers also recovered from a shelf in a closet in the den of the apartment a paper bag containing two boxes of Geco brand .380 caliber ammunition. One full box contained 25 shells. The other box for 25 had only 21 shells in it. Four shells were missing.

Detective Boyle testified that he and his partner drove the route that the defendant, John Branion, told the police he drove on the day of the crime. The route was from the

Ida Mae Scott Hospital at 51st and Prairie, east on 51st Street to Woodlawn, (passing Dr. Branion's apartment), south on Woodlawn to 55th Street, east on 55th Street to Kenwood, north on Kenwood to 54th Street, east on 54th Street to Blackstone, north on Blackstone to 53rd Street, west on 53rd to 1369 East 53rd Street, the place of employment of Maxine Brown, west on 53rd Street to Woodlawn and north on Woodlawn back to 51st Street, where the Branions lived. The detectives testified that they drove the route on six different occasions, with different weather conditions, and had timed the trips with a stop watch. They drove at 30 miles an hour, the legal speed limit. They stated that route took a minimum of 6 minutes to a maximum of 12 minutes. No allowance for stops was made.

The Branion apartment was equipped with a special burglar-proof lock, but there was no sign of any forced entry into the apartment. The deceased did not appear to have been sexually molested. The defendant told the police nothing was missing from the apartment.

The final evidence of the State's case-in-chief concerned the testimony of Maxine Brown. She testified that on December 23, 1967, one day after the defendant's wife was murdered, she and the defendant went to the apartment of Shirley Hudson, a nurse at the same hospital where defendant was employed. Also present at this time was another woman. The defendant and Miss Hudson were friends. While the defendant had a private conversation with Miss Hudson, Mrs. Brown was in the bathroom crying.

On the basis of the above evidence, the trial judge denied defendant's motion for a directed verdict.

Attorney Nelson Brown testified for the defense. He was a brother of the deceased. Brown related that he had arrived at the Branion apartment about 2:30 P.M. on December 22, 1967, after the murder. His purpose in being there was to act as a family friend rather than an attorney.

About 3:30 P.M., the defendant, Brown, and officers Boyle and Anderson went to the police station where the defendant was questioned.

One question related to how the defendant knew his wife was dead when he did not examine her. Brown testified that defendant mentioned "cyanosis" and that he had never mentioned "lividity" as being apparent to him. Brown also testified that Dr. Branion told police that two guns had been stolen, a PPK and the other a collector's item worth $1500 to $2000. On cross-examination, the witness admitted that he had never, prior to trial, told Weil, a prosecutor who had interviewed him, about Dr. Branion missing the two guns.

On rebuttal, officers James McGreal, Michael Boyle, and Harry Anderson disputed the testimony of Nelson Brown.

These rebuttal witnesses denied that Dr. Branion ever mentioned "cyanosis" rather than "lividity" as the reason he did not examine his wife. Finally, the three police witnesses denied that Nelson Brown had ever, up to the time of his testimony on behalf of defendant, told them of any missing weapons.

The defendant did not testify.

To establish motive the State tried to prove that defendant was having an illicit affair with a nurse, named Shirley Hudson, who worked at the same hospital as Dr. Branion, and that the Branions were not happily married. Defense counsel asked for a preliminary examination of Maxine Brown, a witness called by the State, to determine if she would testify to any significant relationship between Shirley Hudson and defendant. The preliminary examination was not allowed, and the defendant's request that she be called as a court's witness was not allowed, but the court let the State ask a number of questions relating to the relationship, which were objected to, and, generally, the objection were sustained.

To questions relating to the location of Shirley Hudson's

apartment she started to disclaim any knowledge of its whereabouts, but later after a recess and after reading a statement she had previously given to the State, she said that Shirley Hudson was employed as a nurse at the Ida Mae Scott Hospital where defendant was also employed. She stated that she accompanied defendant to the apartment of Miss Hudson one day after defendant's wife was murdered. The defendant and Miss Hudson were friends. While defendant and Miss Hudson had a conversation in another room, Mrs. Brown was in the bathroom crying. This testimony tended to prove some relationship between the defendant and Miss Hudson, and because it tended to prove motive the evidence was proper.

The evidence in this case is entirely circumstantial. To support a conviction based on circumstantial evidence it is essential that the facts proved be not only consistent with defendant's guilt, but they must be inconsistent with any reasonable hypothesis of innocence. (*People* v. *Magnafichi,* 9 Ill.2d 169; *People* v. *Willson,* 401 Ill. 68; *People* v. *Wilson,* 400 Ill. 461; *People* v. *Botolinski,* 383 Ill. 608; *People* v. *White,* 347 Ill. 576.) But the People are not required to establish it beyond the possibility of a doubt. *People* v. *Hanson,* 359 Ill. 266; *People* v. *Lucas,* 244 Ill. 603; *People* v. *Depew,* 237 Ill. 574; *Pate* v. *People,* 3 Gilm. 644.

After reviewing the record in this case, we are of the opinion that the State has woven a web of strong circumstantial evidence, strong enough to support the conviction of this defendant. Many of the statements of defendant to police conflict with the testimony of the witnesses, such as Joyce Kelly, the school teacher; Dr. Helen Payne, who examined the body half an hour after death and found no lividity or discoloration present as stated by the doctor to police; and the ballistics expert, Burt Nielsen, as well as the investigating officers. The State also proved to the satisfaction of the jury that the defendant could have been at the scene when the murder was committed, between 11:30

and 11:58 A.M.; and Theresa Kentra, the neighbor, described the "commotion" at Branion's shortly before Dr. Branion came out of his back door after the murder.

But probably the most telling evidence was that the murder was committed with a rare Walther PPK gun like one proved to have been in the possession of defendant earlier that year; and the fact that the bullets found in and around the body could only have come from a Walther PPK. Exactly four bullets were found in and around the body, and when the police found, a month later, a box of .380 caliber bullets designed to hold 25 bullets, with exactly four missing, the evidence was convincing. When the police asked the doctor if he had any .380 caliber guns, he produced only a Hi Standard .380, and did not mention the Walther PPK, which has never been found. This evidence was not explained by the defense.

Complaint was also made of the closing remarks of counsel. We have read the record and do not find that the argument was beyond the bounds of propriety. Defendant makes numerous other assignments of error, none of which we find meritorious.

We, therefore, hold that the evidence supports the verdict of the jury and that the record is free from reversible error.

It is, therefore, the order of this court that the judgment of the circuit court of Cook County be and it is hereby affirmed.

*Judgment affirmed.*

Mr. JUSTICE KLUCZYNSKI, dissenting:

For the reasons set forth herein, I dissent and would reverse and remand the judgment of the circuit court of Cook County.

To establish a motive for the crime the State attempted to prove that defendant was having an illicit affair with a nurse named Shirley Hudson and that defendant and his

wife were not happily married. It is the examination of Maxine Brown on these matters that defendant contends was improper and highly prejudicial:

"PROSECUTOR: Now, Mrs. Brown, do you know a woman by the name of Shirley Hudson?

MRS. BROWN: Yes.

PROSECUTOR: Who is Shirley Hudson?

DEFENSE COUNSEL: Objection.

THE COURT: Sustained.

PROSECUTOR: Do you know what Dr. Branion's relations were with Shirley Hudson?

DEFENSE COUNSEL: Objection.

\*   \*   \*

PROSECUTOR: Following the death of Mrs. Branion on the 22nd day of December, 1967, did you accompany the defendant on a trip to Colorado?

DEFENSE COUNSEL: Object.

THE COURT: Objection sustained.

PROSECUTOR: Did you go, on the 24th day of December '67, two days after the death of Mrs. Branion, to Vail, Colorado?

THE WITNESS: No.

\*   \*   \*

PROSECUTOR: As far as you know, was Shirley Hudson the girl-friend of the defendant, John Branion?

DEFENSE COUNSEL: Object.

THE COURT: Sustained.

PROSECUTOR: Do you know what, if any, relationship Shirley Hudson bore to the defendant?

THE WITNESS: They were friends.

\*   \*   \*

PROSECUTOR: And were you aware of the marital relationship, or state of the marital status prior to her [Mrs. Banion] death?

THE WITNESS: The way it appeared to me, is that what you are asking me?

PROSECUTOR: Yes.

THE WITNESS: Yes, I had an opinion of the appearance.

PROSECUTOR: Would you consider it to be a happy normal marriage or normal releationship?

DEFENSE COUNSEL: Object.

THE COURT: Sustained.

\* \* \*

PROSECUTOR: Did you know of any difficulty between Dr. Branion and his wife prior to her death?

DEFENSE COUNSEL: Object.

THE COURT: Sustained.

PROSECUTOR: Did you know of any plans for divorce by Mrs. Branion or Dr. Branion prior to her death?

DEFENSE COUNSEL: Object.

THE COURT: Sustained."

As stated by the majority, the evidence in this case is entirely circumstantial. In *People* v. *Wilson,* 400 Ill. 461, 480, the court held: "If the evidence is wholly circumstantial it possibly may prove his guilt beyond a reasonable doubt, but it must be closely scrutinized, and if, when fairly considered, it presents another hypothesis consistent with innocence, the latter must be adopted in preference to guilt." The court further stated: "\* \* \* guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence, or by unjustified aspersions or insinuations tending to inflame the minds of the jury." (400 Ill. at 481.) While there is a strong case of circumstantial evidence, I do believe that the jury was prejudiced by an improper questioning.

The prosecution was attempting to establish a motive for the crime but the testimony of Maxine Brown indicated only that defendant and Shirley Hudson were friends and that he had a conversation with Miss Hudson the day after his wife was murdered. The examination did not tend to establish a motive. However it did suggest that Dr. Branion

and Shirley Hudson were having an illicit affair and that the defendant and his wife were not happily married and were contemplating divorce. It also suggested that the defendant was a cold, insensitive person who would take a trip with another woman to a vacation resort immediately following his wife's death. Many of these questions were without foundation and exceeded the limits of proper examination. Even though it was apparent at this point that the witness was uncooperative and often unresponsive, the prosecution persisted in leading, suggestive questioning in the presence of the jury. Sustaining of the objections alone could not remove the prejudicial effect of the constantly repeated insinuations. I therefore believe that the verdict was influenced by prejudice raised by irrelevant evidence and unjustified insinuations. For this reason I would reverse and remand the cause for a new trial.